UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

KENNETH LEE ROE,                    )
                                    )
                Plaintiff,          )
                                    )
v.                                  )        No. 3:05-CV-538
                                    )        (Shirley)
OAKMONT RESORT CONDOMINIUM          )
ASSOCIATION, INC.,                  )
                                    )
                Defendant.          )

**MEMORANDUM OPINION**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 29].

I.          **Introduction**

In this discrimination action, the plaintiff Kenneth Lee Roe ("Roe") alleges that the

defendant Oakmont Resort Condominium Association ("Oakmont") terminated him from his

employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621,

*et seq.* ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*

("ADA"); the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA"); and

the Tennessee Handicap Act, Tenn. Code Ann. § 8-50-103 ("THA").  [Doc. 22].

It is admitted that Oakmont is an "employer" within the meaning of the various state and federal statutes under which the plaintiff brings this action; that Roe filed a charge with the Tennessee Human Rights Commission; and that he received a right to sue letter from the Equal Employment Opportunity Commission dated August 30, 2005. [Doc. 23]. The subject matter jurisdiction of the Court is not in dispute. [Doc. 40].

After carefully considering the entire record, the Court concludes that there are genuine issues of material fact which preclude the granting of the defendant's motion. Accordingly, for the reasons set forth herein, Defendant's Motion for Summary Judgment [Doc. 56] is **DENIED**.

II.        <u>**Relevant Facts**</u>

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiff. In doing so, the Court relies on the depositions of the plaintiff Kenneth Roe and several Oakmont employees, and other testimony and exhibits filed with the Court.

The Oakmont Resort property ("Resort") is a timeshare resort in Sevierville, Tennessee, operated by a not-for-profit Tennessee corporation that is owned by the collective body of timeshare owners of each unit at the Resort. Roe was hired to work at Oakmont on October 6, 1988 as a security guard. His supervisors at the time were Carey and Mary Jane Lockman, the general managers of Oakmont. Roe's duties as a security guard included checking doors, checking people in and out, making rounds every fifteen minutes, helping with any problems, shutting down the outdoor pool and area in the indoor pool, and taking emergency calls on behalf of the Resort.

Although Roe's position was characterized as that of a "security guard," Roe was never licensed or bonded with the State of Tennessee to work as such.

For about the first year after he was hired, Roe worked a 10 p.m. to 1 a.m. shift, seven days per week. After the first year and until his schedule was changed in July, 2004, Roe worked from 8 p.m. until 2 a.m., seven days per week. From 1988 until July, 2004, Roe was the only employee at Oakmont who worked in a "security guard" position.

Roe was diagnosed with colon cancer in April 2003. Roe's physician, Dr. Allan M. Grossman, stated that Roe has a "high grade colon carcinoma with vascular invasion and nodal invasion, and is at high risk for recurrent disease." [Roe Dep. Ex. N]. After his diagnosis, Roe began chemotherapy for six months. Roe did not miss a day of work while on chemotherapy. By November, 2003, the cancer appeared to be in remission. Roe told the Lockmans and others at Oakmont that his cancer had gone into remission. Roe started feeling better about two months after the chemotherapy ended and the effects of the chemotherapy wore off. During the time that he worked as a security guard, Roe never asked for an accommodation for a disability.

While they were the general managers of Oakmont, the Lockmans lived on the property and were available to handle emergencies when no other personnel were on duty. In February 2004, the Lockmans left Oakmont, and the on-site general manager position was eliminated. Before the Lockmans left, Mr. Lockman ran an advertisement in a newspaper for additional security guard personnel. An individual responded to the advertisement and complained that Oakmont was operating a security guard service without a license. After reviewing the matter, Oakmont determined that it could not continue to classify Roe's position as "security guard" and therefore combined the security guard position into a "security and maintenance" or "night

maintenance" position.  Maintenance employees started performing the security duties Roe had handled in his prior security guard position.

David and Linda Lynch replaced the Lockmans as general managers of Oakmont in April, 2004.  The Lynches did not live on the property.  With the elimination of the on-site general manager position, the duty to handle any emergencies became the responsibility of whoever was working on a particular shift.  Subsequently, the Maintenance Department employees' work schedule was changed to a three-shift work schedule: (1) first shift from 8:00 a.m. to 4:30 p.m.; (2) second shift from 4:30 p.m. to 1:00 a.m.; and (3) third shift from 12:00 a.m. to 8:00 a.m.  Oakmont began requiring its maintenance employees to work one of these three shifts, five days a week.  Maintenance employees had preference over new hires as to which shift they chose to work.

Roe was originally placed on the third shift for maintenance.  Roe had liked everything about his prior security guard position.  The security guard position was easier than the security/maintenance position, and he did not want to change jobs.  There were increased lifting requirements with the security/maintenance position, and it was a dirtier job.  Roe testified that the heavy lifting involved in this position bothered him physically and caused internal bleeding.  Nevertheless, Roe told David Lynch that he could do the work required of the security/maintenance position.  He did not ask for an accommodation for a disability in connection with this new position.  Roe did, however, complain about being placed on third shift and asked to take the second shift so that he could spend more time with his family.  Oakmont honored Roe's request for the second shift and placed him in the maintenance rotation, second shift, effective July, 2004.

Roe began working the 4:30 p.m. to 1:00 a.m. shift five days per week, beginning in July, 2004. Assistant General Manager Stephine Gregg noted in Roe's 2004 yearly performance evaluation that Roe "had a problem with changing shift schedule due to the standardization process, but seems to be adjusting." Gregg testified that Roe adequately did his job until the events that led to his termination occurred, and that other than noting his problem with the changing shift schedule, she never gave Roe a negative evaluation.

Roe testified that David Lynch knew that Roe had had cancer and repeatedly asked him if could perform the lifting requirements of the maintenance job. In April, 2004, while Roe was helping David Lynch unload a truck, Lynch noticed that Roe had lost a lot of weight and asked Roe what was wrong. Roe told him that he had had cancer for the past year and had just finished chemotherapy. Lynch asked him if he was sure he would be able to do this job, and Roe said that he could. In May or June, 2004, Roe met with Danny Oakley, David Lynch, Linda Lynch. David Lynch told Roe, "I'm going to have to put you on another shift because I can't get anybody to replace you. You're a dinosaur. Nobody will work that kind of hours and that kind of days and that kind of shift." [Roe Dep. at 64].

On July 2 or 3, 2004, David Lynch told Roe that he was being put on a five-day a week 4:30 p.m. to 1:00 a.m. shift, and that this change was being made "because of [sic] I cannot get anybody to replace you on your shift of hours and your kind of hours and seven days a week, because you're a dinosaur and nobody wants to work that."

Also during a meeting in July, 2004, Linda Lynch asked Roe if he was sure he could do this job because of his cancer. After Roe was shifted to the more physically demanding work in maintenance in July, 2004, the Lynches began checking on Roe almost every night, asking him if

he was having any problems with his illness and inquiring if Roe was able to do his job. Roe testified that these comments were in the nature of "how you doing tonight Ken," "you feeling alright" and "that kind of thing."

In September, 2004, Roe started feeling his symptoms again. Other than a comment to co-worker Dennis McCarter that he was not feeling good, Roe did not tell anyone at Oakmont that he felt his symptoms coming back. Roe did not complain about his symptoms returning because he was afraid he would have been terminated if the Lynches knew about it. Roe testified that the Lynches had told him "if you can't do the job, there's the road" when he was shifted from security guard to maintenance. Roe did not find out "for sure" that his cancer had returned until January or February, 2006.

Roe was not permitted to work any overtime. Roe testified that Gregg told him that the Lynches had said that they did not want him to work anymore overtime because Roe had cancer. Gregg testified that the policy against unapproved overtime was implemented for all hourly employees at Oakmont. According to Gregg, all hourly employees had to have approval from their immediate supervisor, her or the Lynches before working any overtime. Roe does not know if other employees were told that overtime was not permitted without approval, but he did testify that other maintenance workers were allowed to work overtime while he was not.

On Tuesday, January 18, 2005, Roe was scheduled to work his regular 4:30 p.m. to 1:00 a.m. shift. At the end of his scheduled shift at 1:00 a.m. on January 19, 2005, Roe left Oakmont before his replacement arrived. Roe left a note for Danny Oakley stating that his replacement was going to be late. Although Roe was aware that Oakmont started having 24-hour maintenance beginning July, 2004, he had never been told verbally or in writing by anyone that he could not leave

his post if his relief was late. Roe testified that he would have stayed, but he had not been permitted to work overtime. Accordingly, he clocked out when his shift ended at 1:00 a.m.

Roe returned to work on Friday, January 21, 2005, after taking his regularly scheduled two days off, and spoke to Maintenance Manager Danny Oakley about the events at the end of Roe's shift on January 19, 2005. During this conversation, Oakley told Roe that he was being written up because he left the Resort unattended without calling someone first. Specifically, Roe testified as follows:

> He told me that I had to write you up because you didn't call anybody. And I said well Danny I didn't know I was supposed to. And he said well, I was told to write you up. I said well nobody told me I had to call anybody. And he said well the next time you do, call, and he told me who to call. And I said okay I will.

[Roe Dep. at 116]. Roe testified that Oakley did not tell him during this conversation that he was not to leave the Resort unattended.

Oakley completed an "Employee Disciplinary Form" concerning the January 19, 2005 incident. This written warning states as follows:

> Ken left resort unattended at the end of his shift on Jan. 19, 2005. He did not notify his supervisor or Assistant General Manager that there was no one here to relieve him as required. If this happens again it could result in termination. This is the only notice that will be given.

Roe signed the written warning but was not given a copy of the document. Oakley verbally communicated the contents of this writing to him. However, Roe was never told by Oakley or by anyone else at Oakmont that he was not to leave until his replacement arrived.

Near the end of Roe's shift that night, Roe's replacement had not arrived. At approximately 12:40 a.m., Roe called Danny Oakley, Stephine Gregg, and the Lynches to report the problem, but he got no answers. He then called the answering service, and the answering service

operator successfully contacted Stephine Gregg. Gregg told Roe that she would call him back. Roe tried to call Gregg back a few minutes later, but he got a busy signal. Roe clocked out at 1:00 a.m. and left the property a few minutes later. His replacement arrived at approximately 1:20 a.m.

On January 22, 2005, Gregg contacted Linda Lynch and advised her that Roe had left the Resort unattended. Linda Lynch spoke with David Lynch, who in turn contacted Danny Oakley. Oakley contacted Roe and advised him that he was being discharged.

While she agreed with the decision to terminate Roe, Gregg testified that the decision was made by the Lynches without further input from her. Linda Lynch, however, testified that Roe was fired because Danny Oakley and Stephine Gregg wanted him fired. She testified that she and David Lynch left the decision to Oakley and Gregg so that the Lynches could maintain credibility with those managers. Linda Lynch testified that David Lynch would not have fired Roe and had a problem with doing so. Lynch further testified that she blamed Gregg for not writing the Employee Disciplinary Form correctly and agreed that it did not appear that Roe had done anything to violate that written warning as it was written. Danny Oakley testified that David Lynch ordered him to fire Roe and that if he did not do so, he would be fired himself. Oakley testified that he personally did not agree with the decision to terminate Roe because Roe was never allowed an opportunity to explain his side of the story. David Lynch admitted that it was his decision to terminate, but that he was merely "backing up the managers" and would not have terminated Roe if it had been left up solely to him. He denied telling Oakley that if Oakley did not fire Roe, Lynch would fire Oakley.

At the time of Roe's termination, Oakmont did not have a written policy requiring employees to wait until their replacement on their shift had arrived. According to the employee handbook in effect at the time of Roe's termination, the most serious discipline available for a first

act of insubordination was a three-day suspension. The handbook sets forth only nine offenses which call for immediate dismissal, and Roe was never accused of any of these offenses.

At the time of his termination, Roe was 54 years old. Following Roe's termination, Oakmont hired two individuals, both of whom were older than Roe, for the maintenance department. These individuals were not hired to a fill a specific shift. For the first few days after Roe's termination, several maintenance employees replaced Roe on the 4:30 p.m. to 1:00 a.m. shift. A few days following Roe's termination, Dennis McCarter requested a transfer to Roe's former shift, which was granted. At the time, McCarter was 35 to 40 years old.


## III. **The Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; see also Gaines v. Runyon, 107 F.3d 1171, 1174-75 (6th Cir. 1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

IV.     **Analysis and Ruling**

A.     **Age Discrimination**

The Court will first address the plaintiff's claim of age discrimination brought pursuant to the ADEA and the THRA. The plaintiff alleges that he was terminated because of his age and that he was replaced by a younger employee.

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Claims brought under the THRA are governed by the same evidentiary framework that applies to ADEA

claims.   See Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984).

Accordingly, the Court's analysis with respect to the ADEA will apply with equal force to the

plaintiff's claim under the THRA.

A plaintiff may meet his evidentiary burden under the ADEA through direct or

indirect evidence.   Mitchell v. Vanderbilt Univ., 389 F.3d 177, 181 (6th Cir. 2004).   On the one

hand, a plaintiff may offer direct evidence of the employer's discriminatory motive by producing

"evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a

motivating factor in the employer's actions."   Wexler v. White's Fine Furniture, Inc., 317 F.3d 564,

570 (6th Cir. 2003) (en banc) (quoting Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,

176 F.3d 921, 926 (6th Cir. 1999)).   If, on the other hand, a plaintiff is unable to provide direct

evidence of an improper motive, he may offer indirect and circumstantial evidence of such a motive

pursuant to the burden-shifting approach established in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973).

In order to establish a *prima facie* case of age discrimination using circumstantial

evidence under the McDonnell Douglas framework, a plaintiff must show that: (1) he is a member

of the protected class, that is, he is at least forty years of age; (2) he was subjected to an adverse

employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a

younger person.   Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 547 (6th Cir. 2004).

Once the plaintiff has made out a *prima facie* case, the burden shifts to the defendant

to give a legitimate, non-discriminatory reason for the termination.   Rowan, 360 F.3d at 547.   If the

defendant satisfies this burden, the burden shifts back to the plaintiff to show that the legitimate

reasons offered were merely pretext for a decision "actually motivated by an unlawful bias against

age." Id. A plaintiff may satisfy this burden "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Wexler, 317 F.3d at 576 (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000)).

The plaintiff has not presented any direct evidence of an improper motive based upon age; accordingly, the Court must examine the plaintiff's age discrimination claim according to the McDonnell-Douglas burden-shifting framework. The parties do not dispute that the plaintiff was a member of a protected class, that he was qualified for her position, or that he was subjected to an adverse employment action, i.e., termination. The parties do dispute, however, whether the plaintiff was replaced by a younger employee.

Oakmont contends that Roe cannot demonstrate that he was replaced by a younger employee because Oakmont hired two individuals to fill the maintenance positions left vacant by Roe's termination and the departure of another maintenance employee that same week, and these two individuals were older than Roe.

The Court finds that the plaintiff has created at least a question of fact as to whether the plaintiff was replaced by a younger employee in this case. Herbert Moore, the Oakmont company representative, testified that while these two individuals were hired after Roe's termination, they were not hired to fill a specific shift. Rather, within a few days of Roe's termination, Dennis McCarter, who was 35 to 40 years old at the time, began working the shift formerly worked by Roe. Accordingly, the Court finds that the plaintiff has satisfied the fourth element of his prima facie case for the purpose of this summary judgment motion.

Having found that the plaintiff has established a prima facie case of age discrimination for the purposes of summary judgment, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision to fire Roe. Oakmont's stated reason for Roe's discharge is insubordination: specifically, that Roe left the Resort unattended for a second time in a row on January 22, 2005 after clear instructions that he was not to leave the Resort unattended until Gregg called him back. Assuming *arguendo* that the defendant has met its burden, the Court finds that the plaintiff has presented evidence sufficient to create a genuine issue of material fact as to whether the defendant's proffered reason for his termination is pretextual.

None of Roe's managers or supervisors – Stephine Gregg, Danny Oakley, Linda Lynch or David Lynch – admit that they made the decision to terminate Roe. While David Lynch testified that it was his "decision," he stated that he was merely backing up the decision of Gregg and Oakley and in fact did not agree with the termination decision. Gregg and Oakley, however, testified that it was not their decision to terminate Roe, but rather it was a matter for the Lynches to decide. Oakley further testified that he disagreed with the decision to terminate Roe's employment. Linda Lynch also denied having involvement in the termination decision and further testified that she disagreed with the decision as well. While such confusion and denials of responsibility may simply a product of poor management, the Court finds that a reasonable jury could also conclude from this evidence that the reason given by the defendant for the termination did not actually motivate the decision.

The Court further finds that there are questions of fact as to whether the stated justification for Roe's termination – insubordination – was an sufficient basis for his termination. Viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable

inferences in his favor, the Court finds that the evidence presented by the plaintiff regarding the events on January 21, 2005 demonstrates that Gregg did not explicitly instruct Roe to stay until his replacement arrived. Rather, she told him that she would call him back. When she had not called back by the end of his shift at 1:00 a.m., Roe clocked out, and within a few minutes of his shift ending, went home. Roe had not been approved to work overtime that night and in fact had been instructed not to work any overtime at all. At approximately 1:20 a.m., Roe's replacement arrived. Thus, the Resort was left unattended for at most ten to fifteen minutes. Furthermore, the employee handbook that was in effect at the time of Roe's termination stated that the most serious discipline available for a first act of insubordination was a three-day suspension. The handbook set forth only nine offenses which call for immediate dismissal, and Roe was never accused of any of these offenses. A jury could reasonably conclude on these facts that Roe's actions were reasonable under the circumstances and that Roe's "insubordination" for leaving the Resort unattended for a few moments in the middle of the night was an insufficient basis for terminating his employment.

Further, the Court notes that the plaintiff has presented evidence of comments that may be construed as showing discriminatory animus. In May or June, 2004, David Lynch told Roe, "I'm going to have to put you on another shift because I can't get anybody to replace you. You're a dinosaur. Nobody will work that kind of hours and that kind of days and that kind of shift." [Roe Dep. at 64]. On July 2 or 3, 2004, David Lynch told Roe that he was being put on a five-day a week 4:30 p.m. to 1:00 a.m. shift, and that this change was being made "because of [sic] I cannot get anybody to replace you on your shift of hours and your kind of hours and seven days a week, because you're a dinosaur and nobody wants to work that." While such comments could reasonably be construed as a mere reference to the fact that Roe's willingness to work a late-night shift seven

nights per week was reminiscent of an "old-school" work ethic, a reasonable jury could also conclude that these comments were references to Roe's age. At this stage in the proceedings, the Court must draw all reasonable inferences in Roe's favor. Thus, a jury will have to determine which inference to draw from these comments.

Because the plaintiff has set forth facts from a jury could reasonably conclude that the plaintiff was replaced by a younger employee and/or that the defendant's proffered reason for the plaintiff's termination was pretextual, the defendant's motion must be denied as to the plaintiff's age discrimination claim.

### B.    Disability Discrimination

#### 1.    Plaintiff's "Regarded As" Claim

The plaintiff claims that he was also terminated because the defendant regarded him as being disabled. To establish a claim of disability discrimination under the ADA or THA, a plaintiff must show: (1) that he has a disability; (2) that he was qualified to perform the requirements of her job, with or without reasonable accommodation; and (3) that he was discriminated against solely because of his disability. Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002); see also Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000) (stating that THA claim is analyzed under same principles as those used for the ADA).

The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

As the Supreme Court has explained, there are two ways in which an individual may fall within the statutory definition of being "regarded as" disabled:

(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).

In the present case, the plaintiff alleges that he was regarded as being disabled in the major life activity of working. Where the major life activity of working is at issue, "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs' or 'a broad range of jobs in various classes.'" Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469, 479 (6th Cir. 2005) (quoting Sutton, 527 U.S. at 489). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Moorer, 398 F.3d at 479 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). Accordingly, the plaintiff is required to prove that Oakmont regarded him as unable to work in a broad range of jobs. The Sixth Circuit has noted that this is an "extraordinarily difficult" task. Moorer, 398 F.3d at 481. Because direct evidence of such considerations is usually rare, the Sixth Circuit has held "'where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, combined with evidence that the employer concocted a pretextual justification for that firing, the need for more extensive factual inquiry' – *i.e.*, by a trier of fact – 'into whether the employer engaged in unlawful discrimination is especially acute.'" Id. (quoting Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001)). The Court finds that the plaintiff has presented evidence, which if

taken as true, creates a genuine issue of material fact as to whether Roe's health condition played a role in the decision to terminate his employment. Roe testified that Gregg told him that he was not permitted to work overtime because of his cancer. Roe also testified that David Lynch knew that Roe had had cancer and repeatedly asked him if could perform the lifting requirements of the maintenance job. Linda Lynch also asked Roe if he was sure he could do this job because of his cancer. Roe testified that the Lynches had told him "if you can't do the job, there's the road" when he was shifted from security guard to maintenance. Roe therefore did not tell the management at Oakmont that he felt his symptoms coming back in September, 2004 because he was afraid he would have been terminated if the Lynches knew about it. After Roe was shifted to the more physically demanding work in maintenance in July, 2004, the Lynches began checking on Roe almost every night, asking him if he was having any problems with his illness and inquiring if Roe was able to do his job. Roe testified that these comments were in the nature of "how you doing tonight Ken," "you feeling alright" and "that kind of thing." While a jury might reasonably conclude that such comments were merely benign questions of concern regarding the plaintiff's health, a jury also could reasonably conclude that the Lynches had serious concerns as to whether Roe could perform his duties because of his cancer. See Todd v. City of Cincinnati, 436 F.3d 635, 637 (6th Cir. 2006) (reversing grant of summary judgment where hiring officials had "serious doubts" as to whether plaintiff could "physically do the demanding work" required of the job due to a back injury). Moreover, as the Court has already discussed, the plaintiff has presented evidence to show that his

termination was pretextual.  Accordingly, the Court finds that genuine issues of material fact exist as to whether Oakmont regarded Roe as disabled.[1]

## 2.     Social Security Disability Determination

Oakmont argues that the Court should grant its motion for summary judgment as to the plaintiff's disability claims because Roe applied for and received Social Security disability benefits retroactive to May, 2005.  In applying for such benefits, Roe made a sworn statement that he was totally disabled, which, Oakmont argues, should now bar him from being able to show that he is a qualified individual with a disability under the ADA.  At the very least, Oakmont contends, Roe should be barred from seeking damages under the ADA as of the date he was determined to be permanently and totally disabled.

Roe testified that he applied for Social Security disability benefits in May 2005 after unsuccessfully looking for work for several months.  The application for benefits states as follows: "I became unable to work because of my disabling condition on January 21, 2005." [Doc. 56 Ex. O]. Roe testified that he qualified for benefits because of his cancer returning.  He received a "Notice of Award" dated April 24, 2006, and benefits were payable from July, 2005, his first month of entitlement.  He received a back payment of $10,291 and receives $1169 monthly.

----

[1]In opposing the defendant's motion for summary judgment on his disability claim, Roe has submitted the declaration of his wife, Vicki Roe. [Doc. 67 Ex. 9].  In this declaration, Vicki Roe states that activities manager Diane Oakley told her that "Ken and I should watch our backs because she heard David Lynch say that Ken was a dinosaur, he had cancer and David Lynch was going to get rid of Ken." [Id. ¶6].  The defendant argues that this statement is inadmissible hearsay.  The Court agrees that Ms. Roe's statements as to Ms. Oakley's statements about Mr. Lynch's statements appear to be inadmissible hearsay.  Thus, for purposes of this motion, the Court will not consider this statement.

In arguing that Roe should be estopped from pursuing his disability claim, Oakmont relies upon <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795 (1999). In that case, the Supreme Court noted that a declaration of disability in a SSDI benefits application is not necessarily equivalent to a factual assertion that the plaintiff is unable to perform the essential functions of his job. <u>Id.</u> at 802. On the contrary, the Court noted, such a declaration "often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'" <u>Id.</u> However, the Court cautioned as follows:

> An ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation . . . .
>
> . . . When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

<u>Id.</u> at 806-07.

The Sixth Circuit recently addressed this issue in <u>Kiely v. Heartland Rehab. Services, Inc.</u>, 359 F.3d 386 (6th Cir. 2004). In that case, the plaintiff, who was blind, brought a disability discrimination claim under Michigan law. The defendant argued that the plaintiff was precluded for pursuing this claim because he had applied for SSDI benefits, and in so doing, had made a sworn statement that he was "unable to work" due to his disability. The plaintiff argued that he applied for SSDI benefits on the basis of his legal blindness – a listed impairment – and not on the basis of an actual inability to work; accordingly, the statements in his SSDI application were not inconsistent

with his claim that he could perform the essential duties of his job.  The Sixth Circuit found that a reasonable juror could accept the plaintiff's explanation:

> [A] reasonable juror could conclude that when Kiely stated in his application that he was "disabled" and "unable to work," he meant only "I am entitled to SSDI benefits."  As we have previously recognized, such statements in an application for SSDI benefits are "open to interpretation". . . .
>
> The record of the case at bar does not disclose whether the application forms completed by Mr. Kiely afforded him a "fair opportunity" to specify that a listed impairment, rather than an actual inability to work, made him eligible for benefits.  A reasonable juror could easily find, however, that his legal blindness was the basis on which Mr. Kiely expected to receive benefits.

Id. at 390.

Similarly, in the case at bar, Roe has presented evidence that he has a condition – recurrent colon cancer – which is a listed impairment and thus entitled Roe to receive benefits without a showing that he was actually unable to work.  See 20 C.F.R. Pt. 404, Subpt. P., App. 1, 13.18 (2006).  Thus, a reasonable jury could accept Roe's explanation that the statement in his SSDI application that he is "unable to work" is not inconsistent with his assertion that he was able to perform the essential functions of his job at Oakmont.  Accordingly, the Court finds that Roe's declaration of disability in his SSDI application does not necessarily preclude him from asserting that he is a qualified individual with a disability under the ADA or THA.

**V.**  **Conclusion**

For the reasons set forth above, and based upon the entire record in this case,

Defendant's Motion for Summary Judgment [Doc. 56] is **DENIED**.

**ORDER TO FOLLOW.**

ENTER:

___s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge